UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Stephen Simone,

               Plaintiff          08-CV-4884

   -against-                    MEMORANDUM
                                       OPINION
                                       AND ORDER
Michael Astrue,
Commissioner of Social Security

               Defendant.

------------------------------------X
SIFTON, Senior Judge.

Plaintiff Stephen Simone commenced this action against
Michael Astrue, the Commissioner of Social Security ("defendant"
or "Commissioner"), seeking review of defendant's decision
denying his claim for Social Security disability benefits.
Plaintiff claims that he was disabled following an accident that
caused injury to his neck, back, knees, and shoulder, which he
alleged prevented him from performing any work. Now before the
Court is a motion by defendant for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure
and 42 U.S.C. § 405(g). For the reasons stated below, defendant's
motion is denied and the matter is remanded to the Commissioner
for further proceedings consistent with this decision.

## BACKGROUND

The following facts are drawn from the record of proceedings

before the Commissioner and the parties' submissions in connection with this motion. The record includes medical reports and diagnostic tests submitted to the Administrative Law Judge ("ALJ"), as well as additional evidence submitted by plaintiff's counsel to the Appeals Council following the ALJ hearing, including deposition testimony from two of plaintiff's doctors.

## A. Plaintiff's Condition

*Non-Medical Evidence*

Plaintiff is 41 years old. Transcript of Administrative Record at 25 ("Tr."). He attended school through the tenth grade, which he completed in 1984. Tr. 53. In his application for disability benefits, plaintiff reported that he worked as a cable installer from 1988-1990, a car dealer from 1991-1998, a fast food cook from 1998-2002, and a construction worker in 2004. Tr. 49. Each of these jobs required plaintiff to walk or stand for several hours a day, and the two latter jobs required heavy lifting. Tr. 50, 75, 74.

On September 14, 2004, plaintiff while employed in construction was injured on the job at a construction site when a wood column fell on his head. Tr. 49. The Worker's Compensation Board of New York awarded plaintiff benefits in connection with this injury. Tr. 288-89.

Plaintiff reports that, as a result of the accident, he suffers from pain in his neck, lower back, knees, and right shoulder when he looks up, moves too far, sits too long, or walks down stairs. Tr. 89. At times his pain lasts for days. Tr. 90. His hands grow numb. Tr. 86. Plaintiff testified that he suffers headaches daily that sometimes last the entire day. Tr. 378. On occasion sneezing or coughing causes "terrible pain" in his neck, and he has difficulty sleeping at night. Tr. 378, 386. Plaintiff takes pain killers and uses heating pads and ice to relieve the pain. Tr. 91, 91. Plaintiff states that he cannot kneel, squat, or look up, that he can stand for only five or ten minutes at a time, and that he cannot lift anything without triggering pain. *Id*. He needs assistance tying his shoes and does everything slowly. Tr. 59. He has difficulty going up and down stairs, raising his arm to shave, and raising himself from the toilet. Tr. 83, 86. His wife performs all of the household chores. Tr. 59. Plaintiff leaves the house four days a week, engages in light shopping once a week, attends doctor's appointments, and helps take care of his children. Tr. 82-85. He drives a car very rarely and only for short distances. Tr. 378, 385.

Plaintiff testified that he has received epidural injections to treat his pain. Tr. 380. He visits a chiropractor once a week, Dr. Joseph Fricano, who performs adjustments. Tr. 383. Plaintiff further testified that although surgery was recommended for his

neck pain, he has chosen not to undergo the surgery for financial reasons and because he fears the risks associated with neck surgery. Tr. 380.

*Medical Evidence*

Plaintiff's primary physicians are Dr. Igor Stiler, a neurologist, who has treated plaintiff's back and neck, and Dr. Daniel Wilen, an orthopedist, who has treated plaintiff's shoulder and knees. Plaintiff has also regularly seen Dr. Joseph Fricano, his chiropractor. In addition, reports from the following doctors who have examined plaintiff are in the record: Dr. Burton Diamond and Dr. David Benatar, who saw plaintiff in connection with his workman's compensation claim, Dr. David Zelefsky, and Dr. Roma Raja-Nepominiashy. The assessments by plaintiff's doctors and the workman's compensation board doctors differ markedly. In the following sections, I describe the various diagnostic exams made of plaintiff's injuries, the assessments by Dr. Stiler and Dr. Wilen, and the assessments of the remaining doctors.

*1. Diagnostic Exams*

Following his construction accident, plaintiff visited Staten Island University Hospital, where a CT scan of the lower back showed no fracture or dislocation and no blockage of the

nerve pathways in the spine. Tr. 119, 120. However, the scan did reveal disc bulges[1] between the bottom three vertebrae. *Id*. A CT scan[2] of the neck also showed no fracture or dislocation, and no evidence of soft tissue swelling. Tr. 122. The scan did reveal mild to moderate narrowing of the nerve passage on the right side between two vertebrae. Tr. 123. There was no evidence of brain damage. Tr. 124. The x-rays were reviewed by a second doctor, who came to the same conclusions. Tr. 117-118.

An October 19, 2004 MRI of plaintiff's cervical spine showed a herniated disc and a disc bulge in the lower neck, which pressed on the membrane surrounding the spinal cord. Tr. 115. There was no displacement of the vertebrae or compression fractures. Tr. 115. Plaintiff also had an MRI of the lumbar spine, which revealed straightening of the spine and evidence of damaged discs between two of the vertebrae with a disc bulge that appeared to abut one the nerve roots. Tr. 116.

On March 2, 2005, plaintiff underwent MRI scans of his knees and right shoulder, which were reviewed by Dr. Stephen

---

[1]The terms "disc bulge" and "herniated disc" are used to describe findings seen on a Magnetic Resonance Image ("MRI") of the spinal discs. The spinal discs are soft cushions that rest between the bones of the spine, the vertebrae. When a disc is damaged, it may herniate, or push out, against the spinal cord and spinal nerves. A desiccated (dried out) disc may be more prone to damage. A small extension of the disc in the direction of the nerve root is referred to as a disc bulge, whereas a full extension of the disc into the nerve canal is referred to as a herniation. *See* http://www.medicinenet.com/degenerative_disc/article.htm.

[2]"Computed Tomography." *See* http://www.radiologyinfo.org/en/info.cfm?PG=bodyct.

Herskowitz. Tr. 110. Dr. Herskowitz reported that plaintiff's left knee showed minimal swelling around the joint and a Baker's cyst,[3] but no evidence of a tear and no problems in the soft tissues. Tr. 110. However, another doctor who reviewed the MRIs, Dr. Chess, saw evidence of a tear. Tr. 108. Dr. Herskowitz reported that the MRI of plaintiff's right shoulder showed impingement of the rotator cuff, but that it was not serious. Tr. 111. He also found minimal joint degenerative disease,[4] but no evidence of joint effusion or a rotator cuff tear. *Id*. The other reviewer, a Dr. Chess, also found no evidence of a rotator cuff tear. Tr. 109.

*2. Dr. Stiler*

Dr. Igor Stiler first examined plaintiff in September 2004. Tr. 127-29. Dr. Stiler noted that plaintiff's lower back pain was relieved with rest and Advil, and that plaintiff was taking no medicine for hypertension, despite the indications in his medical history that he should do so. Tr. 127. Plaintiff's muscle groups showed normal strength except in his right bicep. Tr. 128. Plaintiff's knees had full range of motion, but could only be moved with pain, and emitted popping sounds. *Id*. Plaintiff's

---

[3]A Baker cyst is swelling caused by fluid from the knee joint protruding to the back of the knee. *See* http://www.medicinenet.com/baker_cyst/article.htm

[4]A type of arthritis caused by inflammation, breakdown and eventual loss of the cartilage of the joints. *See* http://www.medterms.com/script/main/art.asp?articlekey=2932

neck, lower back, and shoulder were tender and also exhibited a decreased range of motion. *Id*. A sensory examination revealed decreased sensation in the areas of skin connected to the nerves of the lower back. *Id*. Dr. Stiler diagnosed post-concussion syndrome,[5] cervical and lumbar radiculopathy,[6] post-traumatic cephalgia,[7] internal derangement of the right shoulder,[8] and knee pain. Tr. 129. He scheduled plaintiff for physical therapy three times a week. *Id*.

In December 2004, Dr. Stiler again examined plaintiff. Tr.

---

[5]Concussion is a mild traumatic brain injury, usually occurring after a blow to the head. Post-concussion syndrome is a complex disorder in which concussion symptoms — such as headaches and dizziness — last for weeks and sometimes months after the impact that caused the concussion. *See* Post-Concussion Syndrome, Definition, available at http://www.mayoclinic.com/health/post-concussion-syndrome/DS01020

[6]Radiculopathy exists when a nerve in the is irritated at the point where it leaves the spinal canal on its way to the extremities. This condition usually occurs when a nerve root is being pinched by a herniated disc or a bony protrusion in the direction of the spinal cord. When a nerve root leaves the cervical spine (neck) it travels down into the arm; when a nerve root leave the lumbar spine (lower back) it travels down into the legs. Along the way each nerve supplies sensation to a part of the skin of the shoulder and arm. It also supplies electrical signals to certain muscles to move part of the arm or hand. When a nerve is irritated or pinched, it may cause weakness in the muscles and skin connected to the nerve, and pain along the path of the nerve. *See* University of Maryland Spine Program, A Patient's Guide to Cervical Radiculopathy, available at http://www.umm.edu/spinecenter/education/cervical_radiculopathy.htm

[7]A cephalgia is a headache. *See* http://www.merriam-webster.com/medical/cephalgia

[8]An internal derangement is the displacement of a component of the joint called the articular disc. The disc is a piece of cartilage located between the ball and socket of the joint, which prevents the bones from rubbing together and allows the joint to move smoothly. If the disc slips out of place or is displaced, it can prevent the proper movement of the ball and socket. Because the deranged joint will continue to try to function, even in an impaired manner, internal derangement disorders often get progressively worse with time. *See* New York Presbyterian Hospital, Internal Derangement Disorders, available at http://nyp.org/health/internal-derangement-disorders.html.

125-26. Dr. Stiler observed tenderness and spasm[9] in the discs of the neck and lower back, tenderness and reduced motion in the right shoulder, and reduce sensation in the right upper and lower extremities. *Id*. The exam found no muscle problems. Tr. 126. Dr. Stiler concluded that plaintiff had cervical and lumbar radiculopathy with derangement of the right shoulder and knees and deemed plaintiff "totally disabled from working." *Id*.

In March 2005, Dr. Stiler observed tenderness and spasm in the cervical and lumbar spine and tenderness in the right shoulder. Tr. 105-06. Dr. Stiler found diminished sensation in the upper and lower right extremities. Tr. 106. He found no problems with muscle control or strength. *Id*. Dr. Stiler stated that plaintiff had a "total disability." *Id*. at 106.

In May 2005, Dr. Stiler performed a nerve conduction study[10] and an electromyography study ("EMG study")[11] on plaintiff's lower and upper extremities. Tr. 153-56. The results of the lower extremities study were normal, revealing no evidence of

---

[9]A spasm is a spontaneous, abnormal contraction of a muscle. *See* http://www.csmc.edu/5694.html.

[10]The nerve conduction study stimulates specific nerves and records their ability to send the impulse to the muscle. The study can show where there is a blockage of the nerve pathway. *See* Cedars-Sinai Spine Center, Nerve Conduction Studies, available at http://www.cedars-sinai.edu/7080.html.

[11]A test that checks the health of the muscles and the nerves that control the muscles. The test is performed by inserting into the muscle a thin needle electrode through the skin, which up the electrical activity given off by the muscles. *See* Electromyography, available at http://health.nytimes.com/health/guides/test/electromyography/overview.html

compression or perhipheral neuropathy.[12] Tr. 155. The study of
the upper extremities showed mild acute radiculitis[13] in the
neck. Tr. 159. The test results were otherwise normal.

In November 2005, Dr. Stiler interpreted an ultrasound of
plaintiff's cervical spine, which revealed inflamation and
fibrous growth in the ligaments. TR. 195-96. Dr. Stiler also
reviewed an ultrasound of the muscle between the spine and the
shoulder,[14] which showed moderate to severe muscle degeneration
and spasm.[15]

Dr. Stiler examined plaintiff in January and February 2006,
and found normal sensory responses and good muscle strength and
control and flexation. Tr. 169, 253. He observed tenderness and
spasm in the cervical and lumbar spine. *Id*. Dr. Stiler again

---

[12]Peripheral nerves carry messages from the brain and spinal cord to
muscles, organs, and other body tissues. Damage or disease of these nerves are
called peripheral neuropathy. *See* Journal of the American Medical Association,
Peripheral Neuropathy Patient Page, available at
http://jama.ama-assn.org/cgi/reprint/299/9/1096.pdf

[13]Radiculitis is pressure on a nerve root that causes pain to radiate
along a nerve path. The location and type of pain depends on the area of the
spine where the compression occurs. Radiculitis in the cervical spine may
cause pain in the neck or radiate down the arm. *See*
http://www.spinaldisorders.com/spinal/index.php?option=com_content&task=view&i
d=71&Itemid=32

[14]The trapezius muscle.

[15]The report states that there is moderate to severe
myofasciitis/myositis and spasm. Myofasciitis is an abnormal infiltrate
surrounding muscle tissue of specialized immune cells called "macrophages," a
type of immune cell important to swallowing and destroying microorganisms.
They also assist other immune cells in the body's response to invading
organisms. Muscle pain is the most frequent symptom. This can be localized to
the limbs or be more diffuse. Other symptoms include joint pain, muscle
weakness, fatigue, fever, and muscle tenderness. *See* Definition of Macrophagic
Myofasciitis, available at
http://www.medterms.com/script/main/art.asp?articlekey=7861

stated that plaintiff had a total disability, and recommended epidural injections for pain. Tr. 169, 254.

On August 23, 2006, Dr. Stiler again noted tenderness and spasm in plaintiff's cervical and lumbar spine, knees, and shoulder. Tr. 269-70. He recommended that plaintiff continue to receive injections for pain, and stated that he would refer plaintiff to a neurosurgeon if the injections did not work. *Id*. Dr. Stiler stated that plaintiff had not yet reached "maximal" improvement. *Id*. Dr. Stiler twice repeated that plaintiff was totally disabled from working. *Id*. One month later, on September 30, 2006, Dr. Stiler stated that plaintiff had "a moderate to marked permanent partial disability." Tr. 273. Plaintiff's muscle strength, reflexes, and sensory responses were normal. Tr. 272. Dr. Stiler again found tenderness and spasm in the cervical and lumbar spine and tenderness in the shoulders and knees. *Id*. He continued to recommend epidural injections, with surgery as a possibility if the injections were ineffective in controlling plaintiff's pain. Tr. 273.

Upon subsequent examinations in October 2006, January 2007, and February 2007, Dr. Stiler continued to find cervical and lumbar spine tenderness and spasm and concluded that plaintiff had a "moderate to marked permanent partial disability." Tr. 275. On April 7, 2007, Dr. Stiler concluded that plaintiff had a "moderate permanent partial disability" and advised plaintiff to

"increase home exercises." Tr. 282. In May 2007, Dr. Stiler
reiterated this conclusion. Tr. 284.

In July 2007, Dr. Stiler examined plaintiff and found the
usual tenderness and spasm, although plaintiff's muscle strength,
sensory responses, and reflexes were normal. Tr. 286. He repeated
his diagnosis of "moderate permanent partial disability." *Id*. In
August 2007, Dr. Stiler concluded that plaintiff could sit or
stand for less than one hour at a time, lift ten pounds, walk for
one to two blocks, and only occasionally climb and balance. Tr.
244-45. He could never stoop, crouch, kneel, or bend, although he
had no problems reaching, pushing, or pulling with either arm.
Tr. 245.

In his deposition testimony taken in October 2006, Dr.
Stiler testified that he had been treating plaintiff for two
years and saw plaintiff approximately once a month. Tr. 306. He
stated that he deferred to Dr. Wilen, the orthopedist, for
opinions on plaintiff's knee and shoulders, and that he focused
on plaintiff's neck and back, where plaintiff's conditions are
neurological in nature. Tr. 319.

In his deposition, Dr. Stiler was asked about an apparent
discrepancy between his two evaluations of plaintiff in 2006. In
August of 2006, Dr. Stiler reported that plaintiff was "totally
disabled from working." Tr. 270. In September of 2006, Dr. Stiler
reported that plaintiff had "a moderate to marked permanent

partial disability." Tr. 273. When asked to explain why he had changed his diagnosis from 'total' to 'moderate to marked,' Dr. Stiler testified that he considers the permanency of the disability to be the relevant factor in determining if a patient is totally disabled, and the determination of the degree of disability, whether it is moderate, severe, or total, is less important. Tr. 328. As of August 2006, plaintiff had not yet had invasive pain management treatments, so Dr. Stiler had not been able to observe plaintiff's reaction to those treatments. Tr. 327. It was only after the treatments that Dr. Stiler was able to conclude that plaintiff had a permanent condition. Dr. Stiler noted that in his own mind he considered plaintiff totally disabled based on the permanency of the condition, but that plaintiff's symptoms didn't meet the listing requirements for being termed "totally disabled," and for that reason Dr. Stiler used the term "moderate." Tr. 328.

Dr. Stiler testified that he believes plaintiff's condition is permanent due to the length of time that the symptoms have persisted, the fact that he has not responded to pain management, and because of the MRIs of the knees and cervical and lumbar spine showing damage.[16] Tr. 310, 324. He stated that he allowed another month after his August, 2006 valuation to see how

---

[16]Dr. Stiler referred to the MRIs of the right shoulder and the cervical and lumbar spines. Tr. 312. He was not familiar with at CT scan taken in September of 2004. Tr. 319. The CT scan stated that there was some narrowing of the nerve pathways. Tr. 320.

plaintiff would respond, after which point he was able to say with a reasonable degree of medical certainty that plaintiff had a permanent disability. Tr. 324.[17] Dr. Stiler testified that although it is clear that plaintiff has a permanent disability, the diagnosis of the degree of disability (whether mild or moderate) may change based on the response to treatment. Tr. 331.

When asked whether there were positive tests that corroborated plaintiff's reports of pain, Dr. Stiler pointed to the fact that plaintiff experienced involuntary spasms when making certain movements, and that these spasms persisted over years of treatment. Tr. 316. Dr. Stiler noted that the spasm was in response to nerve root irritation and was correlated with the evidence of disc damage on the MRI scans. Tr. 334-35. Dr. Stiler also pointed to the EMG test of the cervical spine, which showed a radiculopathy in the cervical spine. Tr. 335.


*3. Dr. Wilen*[18]

Dr. Wilen first saw plaintiff on October 27, 2004, and has

---

[17]Dr. Stiler acknowledged that ideally a determination of permanent disability should not be made until after the completion of treatment, but that the delays in authorization for treatment had slowed the process such that the diagnosis could not wait. Tr. 331.

[18]The record reviewed by the ALJ contains two one-page form reports by Dr. Wilen regarding his diagnosis of plaintiff and ten pages of handwritten notes by Dr. Wilen. *See* Tr. 290-301. Plaintiff subsequently submitted further testimony from Dr. Wilen to the Appeals Council. The grounds for Dr. Wilen's diagnosis of plaintiff, including his severe spasms and muscle weakness, are drawn from the latter testimony. It is not possible to determine from the written notes whether the ALJ had access to this information, as the notes are illegible.

seen plaintiff monthly since that time. Tr. 344-45. On the date
of his first exam, Dr. Wilen found extreme spasm in plaintiff's
neck and back, and tenderness, swelling, and restricted motion in
the shoulder and knees. Tr. 353. He diagnosed plaintiff with
spondylolisthesis,[19] cervical spine derangement, and impingement
syndrome of the right shoulder.[20] Tr. 290. Dr. Wilen concluded
that plaintiff was completely disabled from working. *Id.*

In November 2004, Dr. Wilen tested plaintiff's range of
motion, and found severe weaknesses in the muscles of the upper
and lower extremities. Tr. 356-57. He found that plaintiff had a
33% loss in range of motion in the shoulder, and severe
restrictions in the neck and knees. Tr. 357.

In November 2006, Dr. Wilen found clicking in plaintiff's
shoulder,[21] severe spasm throughout the neck and back, and
restriction of motion and clicking in the knees. Tr. 346. Muscle
strength in the upper and lower extremities was very weak, and
the shoulder and knees also showed abnormal ranges of motion. Tr.
358.

---

[19]Forward slipping of one of the vertebrae, usually seen in the lower
back. *See* http://www.britannica.com/EBchecked/topic/560779/spondylolisthesis

[20]Swelling in the rotator cuff muscles of the shoulder causes increased
pressure to the muscles, because they are surrounded by bone. The compression
and loss of blood flow results in frayed muscle tissue. *See*
http://www.medicinenet.com/impingement_syndrome/article.htm

[21]Popping or clicking in the shoulder can be related to many causes,
including a cartilage tear or rotator cuff tear that is rubbing within the
joint, a subtle instability, or the shoulder moving in and out of socket. *See*
http://www.jointhealing.com/pages/shoulder/shoulder_symptoms.html

In 2006, Dr. Wilen testified that plaintiff would not be able to perform manual labor with his injuries, and stated that surgery on the shoulder would be necessary. Tr. 347-48. Dr. Wilen termed plaintiff totally disabled for performing his past work, and testified that with respect to sedentary work, plaintiff's disability was moderate to marked, indicating that plaintiff could not lift or stand for long periods or sit for more than an hour without moving about. Tr. 350.[22] Dr. Wilen testified that plaintiff's injuries were permanent, although surgery would somewhat improve his shoulder and knee conditions. Tr. 361.

In July 2007, Dr. Wilen diagnosed plaintiff with cervical radiculopathy, degenerative joint disease and numbness in the legs, and recommended future physical therapy. Tr. 291. He stated that plaintiff was "totally disabled." *Id.*

*4. Other Doctors*

In October 2004, neurologist Dr. Burton Diamond examined plaintiff in connection with plaintiff's claim for workman's compensation. Tr. 130-32. Dr. Diamond found normal muscle strength and normal sensory responses. Tr. 131. Dr. Diamond diagnosed resolved cervical and lumbar strain and resolved head trauma, and concluded that plaintiff did not suffer from a

---

[22]Dr. Wilen used the Workers' Compensation Board Guidelines to reach this determination. Tr. 359.

disability. Tr. 132.

In May 2005, plaintiff was again examined by Dr. Diamond, who evaluated his range of motion by instructing plaintiff to perform maneuvers until he felt pain. Tr. 102. Dr. Diamond determined that plaintiff "voluntarily restricted range of motion of the neck and lower back." *Id*. Dr. Diamond stated that plaintiff could sit down and stand up without difficulty and there was no spasm in the lower back, indicating that plaintiff's expressed inability to bend or rotate was "purely voluntary." Tr. 103, 104. Plaintiff's gait was normal. Tr. 103. Coordination was normal, there was normal muscle tone, and all muscle groups were properly active. *Id*. The sensory examination was normal. *Id*. Dr. Diamond concluded that the "decreased range of motion cannot be explained physiologically," and plaintiff was capable of working full time. Tr. 104.

In June 2005, Dr. David Zelefsky performed motion testing of plaintiff's spine, leg and arm, and found strength loss during hip and shoulder flexation that resulted in significant impairment of motion. Tr. 148.

In September 2005, plaintiff was examined by Dr. David Benatar in connection with his workman's compensation claim. Dr. Benatar found reduced range of motion in the lumbar spine, right knee, and right shoulder. Tr. 98. He found no objective evidence to support radiculopathy in the cervical or lumbar spine. *Id*. Dr.

Benetar noted that, although plaintiff complained of tenderness and would not extend or flex his knees when requested, he walked without a limp, and there was no clicking or other evidence of damage to the knee. *Id*. Regarding the right shoulder, based on plaintiff's MRI, Dr. Benatar recommended surgery and physical therapy. Tr. 99. Dr. Benatar concluded that plaintiff had a sprain in his cervical and lumbar spine, sprains in his knees with evidence of a tear on the left side, and possible right shoulder impingement. *Id*. He diagnosed plaintiff with a "moderate disability" according to the workman's compensation guidelines, indicating that plaintiff would be able to perform sedentary work with limited carrying and lifting. *Id*.

In March 2006, plaintiff was examined by Dr. Roma Raja-Nepominiashy. Plaintiff stated that he suffered almost daily headaches, constant pain in his neck radiating to both shoulders, constant lower back pain radiating to his lower right leg, and right shoulder pain increasing with movement and at night. Tr. 219. Plaintiff reported taking the pain killers Darvocet, Seklaxin, and Motrin. *Id*. He reported that he could not walk more than one block, sit or stand more than fifteen minutes, or lift any weight. Tr. 220. The examination found that plaintiff had limited range of motion in his neck and lower back, right shoulder spasm, and tenderness in the neck, lower back, and right shoulder. Tr. 221. He was not able to squat or walk on tip-toe or

on his heels. *Id*. Testing showed normal muscle strength and reflexes. *Id*. Plaintiff walked with a normal gait and was able to get on and off the examining table unattended. *Id*. Dr. Raja-Nepominiashy diagnosed sprain in the lower back and neck, right shoulder impingement, and right shoulder degenerative disease. Tr. 222. The doctor concluded that plaintiff could not perform activities requiring heavy weight lifting, weight handling, bending, and overhead activities requiring use of the right arm. *Id*.

In an undated assessment, Dr. Fricano, plaintiff's chiropractor, stated that he had been seeing plaintiff three times a week since March 2005, and that his last assessment of plaintiff was on March 22, 2006. Tr. 223. Dr. Fricano reported that plaintiff used a lower back brace for support, and that the only medication plaintiff was taking was Motrin. Tr. 227, 229. There was no abnormality in plaintiff's gait. Tr. 225. The diagnosis was leg pain due to nerve impingement in the lower back and brachial neuritis radiculitis.[23] Tr. 223. Dr. Fricano noted that plaintiff had experienced improvement but his prognosis was poor. Tr. 224-25. Dr. Fricano determined, based on his chiropractic exam, that plaintiff could lift up to ten pounds,

_____

[23]Brachial neuritis is characterized by acute pain and weakness with variable muscle degeneration and sensory loss around the shoulder. See Upinder K. Dhand, Brachial Neuritis, available at http://www.medlink.com/medlinkcontent.asp.

stand or walk up to two hours a day, and sit for six hours a day.
Tr. 229.

**B. Procedural History**

On September 22, 2005, plaintiff filed an application for disability benefits, alleging that he had been disabled since September 14, 2004. On October 17, 2005, the Social Security Administration denied plaintiff's application, and plaintiff requested a hearing before an ALJ. A hearing was held on August 29, 2007, at which plaintiff was represented by counsel. On October 10, 2007, the ALJ issued a decision denying plaintiff's application on the ground that, although plaintiff suffered from severe impairments, he retained the residual capacity to perform sedentary work,[24] and therefore was not disabled. On December 11, 2007, plaintiff requested review of the decision from the Appeals Council. On October 6, 2008, the Appeals Council denied the request for review, making the ALJ's decision the final statement from the Commissioner.

---

[24]Federal regulations define sedentary work as follows:
Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. 404.1567(a).

## DISCUSSION

### I. Standard of Review

"The scope of review of a disability determination under 42 U.S.C. § 423(a)(1) involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003). The court must first decide whether the Commissioner applied the correct legal principles in making the determination. *Id.; Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal."). The court must then decide whether the determination is supported by 'substantial evidence' a specified in 42 U.S.C. § 405(g). *Johnson*, 817 F.2d at 985; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401; 91 S. Ct. 1420; 28 L. Ed. 2d 842 (1971)). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual

findings, they are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). Addressing the relationship between the legal and factual review of the Commissioner's decisions, the Second Circuit has stated that "although factual findings by the Commissioner are 'binding' when 'supported by substantial evidence,' '[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'" *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## II. Disability Determination Under the Social Security Act

The Social Security Act states that a person shall be considered to be disabled for the purposes of receiving disability benefits when he or she is "unable to engage in any substantial gainful activity[25] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

---

[25] Substantial gainful activity is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 404.1572.

for a continuous period of not less than twelve months." 42
U.S.C. § 1382c(a)(3)(A). Further, a person will be determined to
have a disability "only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do
his previous work but cannot, considering his age, education, and
work experience, engage in any other kind of substantial gainful
work which exists in the national economy..." 42 U.S.C. §
1382c(a)(3)(B).

Regulations promulgated by the Commissioner set forth a five
step process to determine whether an impairment or impairments
demonstrate a disability. The Second Circuit has described the
five step process as follows:

> First, the [Commissioner] considers whether the
> claimant is currently engaged in substantial gainful
> activity. If he is not, the [Commissioner] next
> considers whether the claimant has a "severe
> impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the
> claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix
> 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as
> age, education, and work experience.... Assuming the
> claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity[26]
> to perform his past work. Finally, if the claimant is
> unable to perform his past work, the [Commissioner]

---

[26]  Residual Functional Capacity ("RFC") is defined by the SSA as
follows: "Your impairment(s), and any related symptoms, such as pain, may
cause physical and mental limitations that affect what you can do in a work
setting. Your residual functional capacity is what you can still do despite
your limitations." 20 C.F.R. § 416.945(a).

> then determines whether there is other work which the
> claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal

quotation marks and citation omitted); *Schaal v. Apfel*, 134 F.3d

496, 501 (2d Cir. 1998); 20 C.F.R. § 416.920(a)(4)(i-v).

The claimant has the burden of demonstrating that he meets

all requirements for benefits. 42 U.S.C. § 423(d)(5)(A). However,

at step five of the analysis, the burden shifts to the Secretary

to show that the claimant can perform other substantial, gainful

work available in the national economy. *Carroll v. Secretary*, 705

F.2d 638, 642 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d 464,

467 (2d Cir. 1982). It is the duty of the ALJ to investigate and

develop the facts and arguments both for and against the granting

of benefits. *See Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir.

2004); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)

("the ALJ, unlike a judge in a trial, must [him]self

affirmatively develop the record in light of the essentially non-

adversarial nature of the benefits proceeding." (internal

quotations omitted)).


## III. Analysis

## A. ALJ Decision

Using the sequential evaluation process, the ALJ found at

step one that plaintiff had not engaged in substantial gainful

activity since September 14, 2004, the date he applied for disability benefits. At step two, the ALJ found that plaintiff suffered from several severe musculoskeletal impairments. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that qualified him as being 'per se' disabled. The ALJ then assessed plaintiff's residual functional capacity and found that plaintiff's complaints of significant functional limitations were not credible. The ALJ first noted that plaintiff's diagnostic studies were "largely benign,"[27] Tr. 22, and next determined that the reports of the doctors who found no disability were better supported by the evidence than those of plaintiff's doctors, who stated that he was disabled from working.

The ALJ stated that he had accorded probative weight to the opinions of Dr. Fricano, the chiropractor, and Dr. Raja-Nepominiashy, finding that they were supported by clinical findings and diagnostic studies; both doctors concluded that plaintiff was capable of performing sedentary work. Tr. 22, 25. Additionally, the ALJ noted that Dr. Diamond and Dr. Benatar found no objective findings to support a diagnosis of radiculopathy, and Dr. Diamond found that plaintiff suffered from no neurological disability. Tr. 24. The ALJ determined that the

---

[27]The ALJ acknowledged that MRI scans of the spine showed disc bulging and disc herniation, and the EMG studies revealed mild radiculitis, but emphasized that nerve conduction studies, muscle strength, and plaintiff's gait were normal. Tr. 22, 24.

opinion of Dr. Stiler regarding the extent of plaintiff's physical limitations was contrary to that of several other doctors who examined plaintiff and unsupported by clinical and diagnostic findings. Tr. 24-25. The ALJ was perturbed by Dr. Stiler's apparent change in diagnosis from 'total disability' to 'permanent moderate partial disability' in August and September of 2006, and found on that basis that the opinion of Dr. Stiler was not entitled to any weight. Tr. 25. The ALJ similarly accorded no weight to Dr. Wilen's finding that plaintiff was totally disabled.[28] *Id*.

Having determined that plaintiff could perform the full range of sedentary work, the ALJ found that plaintiff was unable to perform any of his past relevant work. Tr. 25. The ALJ next considered whether plaintiff could perform any other work in the national economy. He found that plaintiff was a younger individual with a high school education, able to communicate in English, and there were jobs in the national economy that plaintiff could perform, referring to 20 C.F.R. 404.1560(c). On that basis, the ALJ decided that plaintiff was not disabled.

## B. The Commissioner Improperly Applied Legal Standards

## 1. Treating Physician Rule

---

[28] The ALJ referred only to Dr. Wilen's checking of a "totally disabled" box on plaintiff's workman's compensation form; there is no reference to Dr. Wilen's observations of plaintiff upon which the finding was based.

The ALJ improperly applied legal standards by rejecting the opinions of plaintiff's treating physicians, Dr. Stiler and Dr. Wilen,[29] without giving good reasons for doing so.

The opinion of the treating physician must be given controlling weight "if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Carter*, 221 F.2d 126, 134 (2d Cir. 2000); *see also* 20 C.F.R. § 404.1527(d)(2).[30] If the ALJ does not accord controlling weight, the ALJ must "comprehensively set forth [the] reasons for the weight assigned to a treating physician's opinion." *Hallorgan v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see also* 20 C.F.R. § 404.1527(d)(2) (The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to claimant's] treating source's opinion.") "Remand is appropriate where the ALJ fails to provide 'good reasons for not crediting the opinion of a claimant's treating physician.'" *Newbury v. Astrue*, 2009 U.S. App. LEXIS 6147, at *3 (2d Cir.

---

[29]Both doctors treated plaintiff monthly over a two-year period preceding his application for benefits.

[30]The regulations specify the weight to be given to medical opinion evidence as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [listing factors] in determining the weight to give the opinion.

20 C.F.R. § 404.1527(d)(2).

March 26, 2009). An ALJ is said to give "good reasons" for the weight accorded to a treating physician's opinion when he or she considers: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the physician provides evidence and good reasons to support the opinion; (4) the consistency of the medical opinion with the record; (5) whether the physician is a specialist; and (6) any other relevant factors brought to the Commissioner's attention. 20 C.F.R. 404.1527; *see also Schisler v. Sullivan*, 3 F.3d 563, 570-71 (2d Cir. 1993).

*a. Dr. Wilen*

The only reason the ALJ gave for disregarding Dr. Wilen's assessment that plaintiff was totally disabled was that the assessment was made in connection with plaintiff's workman's compensation claim. Dr. Wilen testified that plaintiff had displaced vertebra, cervical spine derangement, shoulder impingement, cervical radiculopathy, degenerative joint disease, and loss of motion in his shoulder, neck, and knees, which conclusions were supported by findings of severe muscle spasms and weak muscle strength. Dr. Wilen determined that plaintiff could not sit for more than an hour without movement, and that

his injuries were permanent. The Commissioner[31] gave no reason
for its failure to discuss Dr. Wilen's diagnosis, which was
consistent with Dr. Stiler's findings and contradicted the ALJ's
statement that plaintiff lacked objective medical findings to
support his claim of disability. The ALJ's failure to apply the
correct legal standard in this and other respects is grounds for
remand. *Pollard,* 377 F.3d at 188-89.


*b. Dr. Stiler*

    The ALJ disregarded Dr. Stiler's opinion on the grounds that
it was unsupported by objective evidence, was inconsistent with
the opinions of other doctors, and the fact that Dr. Stiler
altered his assessment of plaintiff's disability from 'total' to
'moderate or marked' without any corresponding change in
plaintiff's condition. These three grounds for rejecting Dr.
Stiler's opinion do not constitute "good reasons." The ALJ's
statement that Dr. Stiler's findings were contradicted by
"numerous physicians" who have examined plaintiff failed to take
account of the findings by plaintiff's other treating physician,
Dr. Wilen.  Further, the ALJ overstated the degree to which the
findings of other doctors who examined plaintiff supported a
conclusion that he could perform sedentary work. Dr. Zelefsky,

---

[31]It is not clear whether the ALJ had access to Dr. Wilen's treatment
notes or deposition testimony when rendering his decision. However, this
information was certainly made part of the record by the time the Appeals
Council considered plaintiff's petition and rejected his request for review.

found strength loss during hip and shoulder flexation that resulted in significant impairment of motion. Tr. 148. Dr. Raja-Nepominiashy diagnosed sprain in the lower back and neck, right shoulder impingement, and right shoulder degenerative disease, and made no comment regarding plaintiff's ability to perform sedentary work. Dr. Fricano diagnosed plaintiff with nerve impingement in the lower back and acute pain and muscle degeneration in the shoulder, and noted that his prognosis was poor.

The ALJ's statement that there was no objective evidence to support Dr. Stiler's findings ignored the several MRI studies,[32] EMG study,[33] and sonographic studies[34] that showed damage to plaintiff's spine. The ALJ's vague and conclusory statement that these studies were "largely" benign cites no physician's report in support of that conclusion. Tr. 22. Dr. Benatar's report makes no indication that he considered any of these diagnostic tests, and Dr. Diamond and Dr. Roma Raja-Nepominiashy offer no discussion of them although both doctors indicated that they

---

[32]October 2004 MRIs showed straightening of the lumbar spine, evidence of disc degeneration and disc herniation in the neck that impinged on the membrane surrounding the nerve in two locations, straightening of the upper and mid cervical spine, and evidence of disc degeneration in three discs. Tr. 136-37.

[33]The May 2005 EMG study of plaintiff's cervical spine showed evidence of radiculopathy.

[34]Sonograms performed in November 2005 showed inflamation around the vertebrae, especially in the lower neck, and myofaciitis, which is consistent with muscle pain. Tr. 195, 197.

reviewed them. Tr. 96-104, 222.

Regarding Dr. Stiler's change in diagnosis, deposition testimony submitted by plaintiff to the Appeals Council explains the absence of contradiction between Dr. Stiler's August 2006 notation that plaintiff was "totally disabled from working" and his September 2006 conclusion that plaintiff had a "moderate to marked permanent partial disability." One who has a marked permanent disability can be totally disabled from working.[35]  Dr. Stiler explained that prior to September 2006 he had not made a final conclusion regarding plaintiff's disabilities; it was only when plaintiff was unresponsive to certain pain management treatments that Dr. Stiler determined that plaintiff had a permanent disability and that it was moderate or marked. Dr. Stiler explained that he considered plaintiff to be totally disabled, but that plaintiff did not meet certain of the workman's compensation requirements for being classified as 'totally disabled,' leading Dr. Stiler to use the 'moderate to marked' designation. Accordingly, the ALJ's suggestion that Dr. Stiler's change in diagnosis was arbitrary failed to take account of Dr. Stiler's reasonable explanation for the change.[36]

---

[35]The ALJ incorrectly characterized the first report as stating that plaintiff had a "total disability," which would be inconsistent with the finding a month later that he had a "moderate disability." *See* Tr. 25.

[36]Even if the ALJ did not have access to this testimony, his reasoning was no longer valid by the time the Commissioner's decision became final upon denial of review by the Appeals Council, which did have access to Dr. Stiler's deposition. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

## 2. Plaintiff's Credibility

The ALJ did not properly evaluate plaintiff's credibility. Although the ALJ properly listed the factors given in 20 C.F.R. § 404.1529(c)(3) for consideration in cases in which a claimant's symptoms suggest a greater severity of impairment than is shown by objective medical evidence or where there is conflicting evidence regarding claimant's pain, he did not analyze those factors or incorporate them into his analysis.[37] After reciting the factors, the ALJ repeated plaintiff's account of his subjective limitations, noted plaintiff's medications and the fact that plaintiff suffered no side effects, noted that plaintiff's daily activities were limited, and noted that plaintiff possessed a valid driver's license. The ALJ did not identify what facts he found to be significant, indicate how he

---

[37]The following factors are listed in the regulation:
(i) daily activities;

(ii) The location, duration, frequency, and intensity of pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication;

(v) Treatment, other than medication, received for relief of pain or other symptoms;

(vi) Measures taken to relieve pain or other symptoms (e.g., lying flat on one's back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning functional limitations and restrictions due to pain or other symptoms.
*See* 20 CFR 404.1529(c)(3).

balanced the various factors, or specify which of plaintiff's alleged symptoms he found to be not credible. Instead, the ALJ devoted his analysis to his erroneous conclusion that there was a lack of objective evidence supporting plaintiff's claims.

Social Security regulations specify that a claimant's statements about the intensity and persistence of pain or other symptoms or the effect of symptoms on one's ability to work will not be rejected solely because the available objective medical evidence does not substantiate the claimant's statements. 20 CFR 404.1529(c)(2). In this case, the ALJ did not offer any analysis of the factors prescribed for evaluating subjective pain, and instead relied simply on the lack of objective evidence to discredit plaintiffs' claims regarding his symptoms. The ALJ's failure to comply with the regulatory requirements for evaluating plaintiff's credibility requires remand.

## C. Substantial Evidence

The evidence cited by the ALJ in support of his decision was insufficient to justify his conclusions.[38] Because I determine

---

[38] Having minimized and disregarded the findings of several diagnostic studies showing damage to plaintiff's neck, back, shoulder, and knees, the ALJ based his finding that plaintiff was not disabled on the following evidence: (1) nerve conduction studies were normal; (2) Dr. Benatar found no objective evidence for radiculopathy; (3) Dr. Diamond determined that plaintiff did not suffer from a neurological disability; (4) Dr. Stiler noted that plaintiff had normal strength in 2007; (5) the chiropractor's opinion that plaintiff could perform sedentary work; and (6) Dr. Raja-Nepomniashy's opinion that plaintiff should avoid heavy lifting and carrying and other strenuous activities. This does not constitute substantial evidence in support of the ALJ's opinion. I address each piece of evidence in turn: First, the fact that nerve conduction

that remand is necessary due to legal errors in the ALJ's
opinion, I need not review the record to determine if there
exists other substantial evidence to support the ALJ's
conclusion.[39] *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.

---

[39]studies were normal does not rule out nerve damage as the cause of pain. *See*
Christopher G. Goetz, MD, Textbook of Clinical Neurology, 3rd Ed., "Nerve
Conduction Studies" (2007 Saunders, an Imprint of Elsevier) ("Several
neurophysiological tests are used to evaluate disorders of the central or
peripheral nervous system affecting pain and temperature sensations. Nerve
conduction studies and needle electromyography allow for precise localization
and characterization of a peripheral nerve lesion disclosing an axonal or
demyelinating disorder. It must be stressed that conventional
electrophysiological studies evaluate the function of motor and large-caliber
afferent fibers, leaving unexplored the function of small-caliber afferents
involved in pain and temperature sensation... Therefore, a normal nerve
conduction study does not necessarily rule out a peripheral nerve lesion as
the cause of the pain.").

Second, the EMG study supporting a finding of radiculopathy was not
discussed by Dr. Benatar in his report, undermining Dr. Benatar's conclusion
that there was no evidence of radiculophathy. Third, Dr. Diamond did not
reconcile his findings of no disability with the results of the MRIs showing
damage to multiple discs and impingement of the nerve at several locations,
undermining his conclusions. Fourth, Dr. Stiler's finding of normal strength
was contradicted by Dr. Wilen's finding that plaintiff suffered from
significant muscle weakness. Fifth, the regulations state that a
chiropractor's finding shall not be afforded the same weight as that of a
medical doctor, and therefore Dr. Fricano's determination that plaintiff could
perform sedentary activity does not constitute substantial evidence in light
of findings by plaintiff's treating physicians to the contrary. Moreover, Dr.
Fricano's assessment was limited to plaintiff's back complaints and therefore
did not take into account all of plaintiff's limitations. Sixth, Dr. Raja-
Nepominiashy did not comment on plaintiff's capacity for sedentary work, and
as such her conclusion regarding plaintiff's incapacity to perform heavy
lifting is not substantial evidence in support of the ALJ's finding.

[39]Plaintiff asserts that the ALJ's opinion must be overturned on
certain grounds that are inapplicable: the ALJ did not consult a vocational
expert to determine if there were jobs in the national economy that plaintiff
could perform; the ALJ failed to consider the effect of plaintiff's
hypertension and high cholesterol on his health; and the ALJ should not have
relied on the findings of Dr. Diamond and Dr. Benatar, given the fact that
both were paid insurance consultants. These arguments lack merit. A vocational
expert is necessary in cases where the claimant suffers from nonexertional
impairments that limit his ability to work; such is not the case here. *See
Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). Regarding the second
argument, plaintiff never identified hypertension and high cholesterol as
disabilities for which he sought to receive benefits, not did he mention any
functional limitations imposed by these conditions at the hearing, nor is
there evidence in the record that these conditions limit his ability to work.
As for the claim that Dr. Diamond and Dr. Benatar's conclusions should be
rejected because they were working for the insurance company, the Second

1984) ("Failure to apply the correct legal standards is grounds

for reversal.").


**CONCLUSION**

For the reasons stated herein, the defendant's motion for

judgment on the pleadings is denied. The case is remanded to the

Commissioner of Social Security for additional proceedings

consistent with this opinion. The Clerk is directed to transmit a

copy of the within to all parties.

SO ORDERED.

Dated :    Brooklyn, New York
           September 16, 2009

                        By: /s/ Charles P. Sifton (electronically signed)
                            United States District Judge

---

Circuit has rejected the view that a consultative examiner is necessarily
biased. *See Diaz v. Shalala*, 59 F.3d 307, 314 n.9 (2d Cir. 1995).